FILED

2013 NOV -6  AM 10: 34

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
         DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

MARK MCNULTY AND CHARLES        §
FORMAN, ON BEHALF OF            §
THEMSELVES AND ALL OTHERS       §
SIMILARLY SITUATED,             §
                  PLAINTIFFS,   §
                                §
V.                              §      CAUSE NO. A-13-CV-026-LY
                                §
ROBERT L. KANODE AND DONALD     §
E. GOTTSCHALK,                  §
                  DEFENDANTS.   §

## ORDER

Before the court in the above-styled and numbered cause of action are Defendants' Motion to Dismiss Plaintiffs' Class Action Consolidated Complaint filed April 25, 2013 (Clerk's Doc. No. 30), Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss Plaintiffs' Class Action Consolidated Complaint filed May 24, 2013 (Clerk's Doc. No. 31), and Defendants' Reply Brief in Support of Their Motion to Dismiss filed June 14, 2013 (Clerk's Doc. No. 32). Having reviewed the motion, response, reply, pleadings, and relevant law, the court will grant Defendants' motion.

## I. Background

Plaintiff Mark McNulty originally filed this securities-fraud class action in the United States District Court for the Southern District of New York on September 10, 2012, on behalf of all persons who purchased Valence Technology, Inc. (Valence) securities between August 3, 2011, and July 12, 2012. On November 16, 2012, pursuant to the Private Securities Litigation Reform Act of 1995, the New York court appointed Charles Forman as lead Plaintiff in this action. See 15 U.S.C. § 78u-4. The parties thereafter stipulated to transfer venue to the Western District of Texas, Austin Division.

Plaintiffs filed their amended class-action complaint in this court on March 25, 2013 (Clerk's Doc. No. 29).

Valence is an Austin, Texas-based alternative-energy company that develops, manufactures, and sells lithium iron magnesium phosphate rechargeable batteries (lithium-ion batteries) to be used in hybrid and electric vehicles, including Segway, Inc. personal transporters, and industrial and marine equipment. Lithium-ion batteries are an emerging technology and, according to Plaintiffs, the lithium-ion battery industry has had "a long history of false starts, promising innovations, and unfulfilled potential." Since Valence's inception in 1989, it has not made a profit and has suffered net losses between $12 million and $70 million every year of its operation.

Valence has financed its operating activities primarily by selling equity securities and issuing debt and, between 1989 and 2012, raised over $550 million through various stock issuances. Valence's daily operations, however, were primarily funded by Carl E. Berg, Valence's largest shareholder and Chairman of its Board of Directors. Berg invested over $100 million in Valence over the years and owned nearly all the company's debt.

Valence's 2011 Form 10-K reported only $2.9 million in cash and cash equivalents at the end of Valence's 2011 fiscal year.[1] According to Valence's 2012 Form 10-K, Valence ended its 2012 fiscal year in an even worse financial position, with only $1.4 million in cash reserves, which, according to Plaintiffs, was insufficient to fund its operating and capital needs for even one month.

---

[1]The Securities Exchange Act of 1934 (Exchange Act) requires every issuer of registered securities to file an annual report with the Securities and Exchange Commission (SEC) each fiscal year. 15 U.S.C. § 78m; 17 C.F.R. § 240.13a-1. The SEC's Form 10-K is used for all annual reports filed pursuant to Section 13 or 15(d) of the Exchange Act for which no other form is prescribed. *See* 15 U.S.C. §§ 78m, 78o(d). Valence's fiscal year ended each year on March 31. The court will therefore refer to the annual report filed for the fiscal year ending March 31, 2011, as Valence's 2011 Form 10-K, and for the fiscal year ending March 31, 2012, as Valence's 2012 Form 10-K.

In addition, by July 2012, Valence owed Berg and his affiliates $69.1 million in loans, and all of Valence's assets were pledged as collateral to secure these loans. A $3 million loan payment was due to Berg by July 3, 2012. Valence failed to secure additional financing from Berg or to find additional funding alternatives and, on July 12, 2012, filed a voluntary petition for Chapter 11 bankruptcy protection. As a result, Valence shares declined from a closing price of $0.65 on July 13, 2012, to $0.05 on July 16, 2012.

Plaintiffs allege that Valence's Chief Executive Officer and President Robert L. Kanode and Valence's Acting Chief Financial Officer Donald E. Gottschalk violated section 10(b) of the Exchange Act and Rule 10b-5 of the SEC by making false and misleading statements about Valence's capital position, liquidity, and business prospects as a going concern. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. Plaintiffs also assert a claim under section 20(a) of the Exchange Act, which provides for control-person liability, against Kanode. *See* 15 U.S.C. § 78t(a).

Section 10(b) of the Exchange Act makes it unlawful for any person, directly or indirectly:

> [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 makes it unlawful for any person, directly or indirectly:

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. The Exchange Act's control-person provision makes a person who controls another jointly and severally liable for the other's fraud. 15 U.S.C. § 78t(a).

Plaintiffs' complaint focuses on a number of statements made by Kanode or Gottschalk[2] during the year before Valence filed for bankruptcy that allegedly misrepresented Valence's future as a going concern. The statements identified by Plaintiffs were made during a series of conference calls with investors, media representatives, and analysts concerning Valence's financial results (August 3, 2011, February 8, 2012, and May 23, 2012), at a global technology conference on February 23, 2012, and in a May 23, 2012 press release. In making allegations of securities fraud, Plaintiffs rely on publicly available information, including statements contained in Valence's filings with the SEC, communications from previous Valence board members, and interviews with a confidential witness, who was a project buyer and component engineering specialist at Valence from 2010 through July 2012.

Plaintiffs' allegations of fraud are essentially two-fold. First, Plaintiffs claim that Defendants[3] knew that Valence faced product-quality issues that adversely affected Valence's financial viability, yet failed to disclose that knowledge when questioned about recent declines in sales. According to the confidential witness, Valence had longstanding battery-quality issues that caused Smith Electric Vehicles (Smith), one of Valence's largest customers, to return approximately 50% of shipped orders due to product failures. Plaintiffs claim Smith later cancelled pending contracts, and Segway, the second largest Valence customer, also decreased orders due to the same quality issues. Plaintiffs contend that although Defendants disclosed the decrease in Smith and

---

[2]Only one statement at issue in this case was made by Gottschalk.

[3]Plaintiffs' complaint refers collectively to Kanode and Gottschalk as Defendants, and the court will do so herein except where more specificity is necessary to differentiate the two.

Segway orders to investors, they omitted that quality concerns were the reason for the cancellations and would likely impact cash flow, future contracts, and the ability to continue operations.

Second, Plaintiffs aver that Defendants knew Valence was headed for bankruptcy, yet when directly questioned about that possibility, repeatedly assured investors of Valence's financial stability. Plaintiffs claim that by May 2012, Defendants already knew Valence had no further commitments for financing for Berg, that Valence was not pursuing funding alternatives, and that bankruptcy was inevitable. Plaintiffs assert Defendants misled the investing public when, despite the inevitability of bankruptcy, they continued to make statements regarding Valence's funding and business prospects. Had they been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements, Plaintiffs claim they would not had purchased Valence securities at the offered price.

Defendants now move to dismiss Plaintiffs' claims for failure to state a claim for securities fraud under Federal Rule of Civil Procedure 12(b)(6) and on the basis that Plaintiffs' complaint fails to satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act (Reform Act) and Federal Rule of Civil Procedure 9(b).

## II. Legal Standard

Rule 12(b)(6) allows for dismissal of an action "for failure to state a claim upon which relief can be granted." Although a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, in order to avoid dismissal, the plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

action will not do." *Id.* The Supreme Court expounded on the *Twombly* standard, explaining that a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a motion to dismiss, the court must construe the complaint liberally and accept all of the plaintiff's factual allegations in the complaint as true. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2009).

Rule 9(b) imposes a heightened pleading standard and requires plaintiffs in securities-fraud cases to plead with particularity the circumstances constituting the alleged fraud. *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010). The Reform Act reinforces the particularity requirements of Rule 9(b). *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (citing 15 U.S.C. § 78u–4(b)(2)).

To state a securities-fraud claim under section 10(b) and Rule 10b-5, Plaintiffs must plead (1) a misstatement or omission; (2) of material fact; (3) made with the intent to deceive, manipulate, or defraud; (4) on which Plaintiffs reasonably relied; and (5) that proximately caused Plaintiffs' injury. *Southland*, 365 F.3d at 362. To satisfy the heightened pleading requirements of Rule 9(b) and the Reform Act, a plaintiff must:

> (1) specify the each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;
>
> (2) identify the speaker;
>
> (3) state when and where the statement was made;
>
> (4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby;

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent; and

(7) if the allegations are made on information and belief, state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.

*ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). The Reform Act also requires that the complaint, with respect to each act or omission alleged to be false or misleading, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### III. Analysis

Defendants move for dismissal of Plaintiffs' securities-fraud claims on the basis that Plaintiffs' complaint fails to sufficiently plead a material misstatement or omission or Defendants' intent to defraud the investing public. *See Southland*, 365 F.3d at 362; *ABC Arbitrage*, 291 F.3d at 350. Defendants do not challenge the sufficiency of Plaintiffs' claims as to the elements of reasonable reliance and loss causation. *See Southland*, 365 F.3d at 362.

A.    *Relevant Law*

(I)    Material Misstatements and Omissions

Under the heightened pleading standards governing Plaintiffs' complaint, Plaintiffs' complaint must allege facts or further particularities that, if true, demonstrate that Defendants had access to, or knowledge of, information contradicting their public statements when they were made, or that they engaged in selective disclosure by failing to reveal known adverse facts. *See In re K-tel Int'l, Inc. Secs. Litig.*, 300 F.3d 881, 891 (8th Cir. 2002) (emphasis added); *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994). Plaintiffs must plead with particularity both why the alleged

misstatements and omissions are misleading and set forth an adequate factual basis for that belief. *ABC Arbitrage*, 291 F.3d at 350.

A misleading statement or omission, however, is only actionable if it is material. *Southland*, 365 F.3d at 362. "A fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* (internal quotations and citation omitted). In other words, "materiality is determined by evaluating whether there is a substantial likelihood that the false or misleading statement would have been viewed by the reasonable investor as having altered the total mix of information made available." *ABC Arbitrage*, 291 F.3d at 359 (internal quotations and citations omitted).

Vague optimistic statements that contain no concrete factual or material misrepresentation are considered mere puffery and are by definition nonactionable. *Southland*, 365 F.3d at 372. *See also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 418 (5th Cir. 2001) ("generalized positive statements about a company's progress are not a basis for liability"). Additionally, "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993). The Reform Act codifies this principle by expressly limiting liability for forward-looking statements, whether written or oral, in the act's "safe-harbor" provision. 15 U.S.C. § 78u-5. A forward-looking statement enjoys "safe harbor" under the act if: (1) the statement is accompanied by meaningful cautionary language; (2) the statement is immaterial; or (3) the plaintiff fails to prove the defendant had actual knowledge that the statement was false. *Id.* at § 78u-5(c)(1).

Defendants contend that Plaintiffs fail to plead the falsity of any alleged misstatement with sufficient particularity, and there can be no actionable omission where Valence's contemporaneous SEC filings repeatedly and prominently disclosed that Valence was facing severe liquidity issues and was close to bankruptcy. Defendants also assert that the majority of the alleged misstatements are forward-looking statements protected under the Reform Act's safe-harbor provision or constitute general statements of corporate optimism that cannot serve as a basis for liability. With respect to Plaintiffs' product-quality claims, Defendants claim the information garnered from the confidential witness is too vague to allege falsity or materiality.

(ii)    Scienter

The necessary state of mind for a section 10(b) claim is an "intent to deceive, manipulate or defraud," or "severe recklessness." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008). The Reform Act requires a plaintiff to plead specific, particularized facts giving rise to a "strong inference" of scienter as to each act or omission for each defendant. 15 U.S.C. §78u-4(b)(2); *see Southland*, 365 F.3d at 364–66. The Supreme Court has held that the appropriate scienter analysis is whether all the facts taken together—including those facts that tend to negate fraudulent intent—sufficiently raise the requisite strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *see Ind. Elec.*, 537 F.3d at 533. When all of these facts are considered together, the inference must be "cogent and compelling," not merely "reasonable or permissible," and the inference can be "strong" only if it is at least as compelling as any opposing inference of nonfraudulent intent. *Tellabs*, 551 U.S. at 323. As to the required element of scienter, Defendants contend that there can be no intent to defraud the

investing public where Valence repeatedly disclosed its dire financial situation, product-quality issues, and the possibility of bankruptcy.

B.    *Defendants' Alleged Misstatements and Omissions*

    (i)    <u>August 3, 2011 Conference Call:  Statements Regarding the Urgency of Funding</u>

Valence hosted this conference call to discuss its first quarter 2012 financial results (April through June 2011).  At that time, Valence had recently raised $12.3 million in a private stock sale. A participant in the call asked Kanode whether Valence would be "very active" with private stock sales over the next three to six months, or whether the recent offering was "enough to keep you guys going until break-even?"  Kanode responded:

> I can only tell you at this point, we have no plans to do this or not do this at the moment.  In other words, there is no pressing urgency to do any other funding at the moment.

Plaintiffs claim these remarks were false and misleading, because Kanode knew and failed to disclose that Valence was facing a significant cash shortfall in the coming months.

To determine whether a statement constitutes a misrepresentation, this court must view the statement in the context in which it was made.  *See In re Manulife Finc. Corp. Secs. Litig.*, 276 F.R.D. 87, 101 (S.D.N.Y. 2011).  Defendants attach to their motion to dismiss the full transcript of two of the three conference calls at issue, as well as numerous contemporaneous SEC filings.[4]

---

[4] The SEC filings include the following: Valence's 1999, 2003, and 2006–2012 Form 10-Ks; Schedule 14A proxy statement dated July 22, 2011; Form 10-Qs dated August 3, 2011, and February 8, 2012; and Form 8-K dated November 27, 2012.

The SEC requires the public filing of a Schedule 14A proxy statement when an issuer of registered securities solicits shareholder votes.  17 C.F.R. § 2401.14a-3.  Form 10-Q is used for quarterly reports to the SEC as required under Section 13 or 15(d) of the Exchange Act.  15 U.S.C. §§ 78m, 78o(d);17 C.F.R. §§ 240.13a-13, 240.15d-13.  Form 8-K is the general form used to notify investors of any material event that is important to shareholders as required under the SEC's disclosure requirements.  17 C.F.R. §§ 230.425, 240.13e-4©, 240.14a-12, 240.14d-2(b).

"Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). In reviewing a 12(b)(6) motion to dismiss for securities fraud, however, this court "may take judicial notice of and consider the contents of relevant public disclosure documents that are required by law to be filed with the SEC, and are actually filed with the SEC, with the restriction that these documents may be considered only for the purpose of determining what statements they contain and not for proving the truth of their contents." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 881–82 (S.D. Tex. 2001) (citing *Lovelace*, 78 F.3d at 1017–18). Accordingly, the court will consider all the documents attached to Defendants' motion because they are either public disclosure documents that were filed with the SEC or transcripts that were explicitly referenced in the complaint.

Although Valence's 2011 Form 10-K, which was the most recent annual report at the time of the August 3 conference call, reported that Valence ended its 2011 fiscal year in an extremely vulnerable financial position, the call fell at the end of a strong first quarter of Valence's 2012 fiscal year. During the call, Kanode reported that Valence's recent private stock sale and a short-term loan from Berg & Berg Enterprises had created proceeds of $12.3 million. Additionally, Valence had generated $14.1 million in revenue, a growth of 153% from 2011's first quarter, and finished the quarter with $11.6 million in cash and cash equivalents, as opposed to $2.9 million at 2011's year end. Plaintiffs do not contend that any of this financial information was incorrect or misrepresented by Kanode.

Viewing Kanode's statement against this backdrop, the court finds Plaintiffs have failed to plead any facts that demonstrate the falsity of Kanode's representation that Valence had "no pressing

need to do funding at the moment," when asked if Valence would be "very active" with private stock sales over the next three to six months. Plaintiffs' allegations that Valence generally faced a significant cash shortfall in the coming months are insufficient to satisfy Rule 9(b)'s heightened pleading requirements, particularly in light of the current financial information provided to call participants. *See ABC Arbitrage*, 291 F.3d at 350. Plaintiffs have failed to plead sufficient facts that Kanode's statement was false or omitted any material fact at the time it was made. Accordingly, this statement cannot give rise to a claim of securities fraud. *See Southland*, 365 F.3d at 362.

(ii)    August 3, 2011 Conference Call: Statements Regarding Smith and Segway Accounts

During this same conference call, an investor also questioned Kanode about Valence's expected earnings from a backlog of unfulfilled orders for Smith and when the backlog of orders would be fulfilled. Kanode responded that Valence was "currently looking at [Smith's] schedules." When asked whether Smith could cancel the backlogged orders, Kanode responded, "Yes. They can cancel anything. . . . We would not expect them to, they have an ongoing business." A third participant questioned Kanode regarding decreased sales to Smith and another of Valence's customers, Segway. Kanode responded:

> Well, first of all, Segway is not down. . . . The second thing I want to mention
> is that Segway is a seasonal business. So you will see it fluctuate from time
> to time. But they still—Smith and Segway are still valued customers. We
> serve them to the best of our ability. We value them and hope to retain them.

Plaintiffs claim these remarks were false and misleading because Kanode knew and failed to disclose that Valence was experiencing "massive product quality issues" and, as a result, Smith and Segway were cancelling orders. By failing to disclose the likelihood that Smith's backlog would not result in revenues and that sales to Smith and Segway were decreasing, Plaintiffs contend Kanode gave a false impression and "perpetuated the facade" that Valence's revenues would

continue to grow. Kanode argues any claim of fraud based on these statements should be dismissed, because the information provided by the confidential informant as to Valence's product-quality issues is too vague to satisfy Plaintiffs' pleading burden and does not give rise to a plausible claim that at the time of Kanode's statements, he knew they were materially false or incomplete. This court agrees.

Plaintiffs' allegations of fraud with respect to Kanode's responses regarding Smith and Segway accounts rely exclusively on information obtained from a confidential witness. When plaintiffs rely on the statements of an anonymous source to meet their pleading burden, they must either (1) identify documentary evidence that provides an adequate basis for believing that the defendants' statements were false and misleading, or (2) provide sufficient particularity that a person in the source's position would possess the information pleaded to support the falsity of the challenged statements. *Id.* at 353–54. Because Plaintiffs do not provide any documentary evidence to support their product-quality claims, Plaintiffs must plead sufficient facts that a person in the confidential witness's position would posses information on Valence's "massive product quality issues" and the return and cancellation of pending orders. *See id.*

The complaint identifies the confidential witness (CW) as a product buyer and component engineering specialist who worked at Valence from 2010 to July 2012. According to Plaintiffs' complaint, CW was responsible for working on new product builds with Valence's engineers and the procurement of hard-to-find components and parts needed to complete customer builds. CW reported directly to Valence's director of engineering and claims to have worked with the engineers who worked to resolve all quality issues. Plaintiffs contend that by virtue of CW's position, CW was privy to information concerning quality issues and customer returns. The court finds CW's identity

13

is described in sufficient detail to support the probability that CW possessed the information Plaintiffs allege, and the court will consider CW's allegations without requiring that CW be named. *See id.* at 354. However, even accepting CW's information as true, the court finds Plaintiffs' allegations insufficient to give rise to a plausible claim that Kanode engaged in fraud when discussing the Segway and Smith accounts on August 3.

The facts obtained from CW amount to the following: Valence suffered from "battery-quality issues" during the years 2010 through July 2012; the issues impacted Valence's ability to secure and keep business from Valence's large customers, including Smith and Segway; CW thought these issues resulted from rushing to fulfill orders rather than making a quality product; Smith was returning batteries by the hundreds; CW estimated that Smith returned at least 50% of the batteries ordered and shipped; Smith pulled business from Valence and gave it to a different supplier due to these issues. Based solely on these allegations, Plaintiffs claim Kanode engaged in fraud when he failed to disclose Valence's battery-quality issues to investors and analysts on August 3, 2011, when asked specific questions about the backlog of Smith orders and Segway's account. The pleaded facts do not support such an inference.

First, the majority of Kanode's statements regarding Smith and Segway contain no representations of material fact and represent classic examples of general statements of corporate optimism that cannot be a basis for liability. Kanode's representation that "Smith and Segway are still valued customers" and that Valence "value[s] them and hope[s] to retain them" are nonactionable as a matter of law. *See Southland.*, 365 F.3d at 372. Nor are there any particularized facts in Plaintiffs' complaint to suggest that at the time of the August 3 conference, Kanode knew but failed to disclose that, due to battery-quality issues, Segway revenues were down or that Smith

had cancelled or was certain to cancel its backlog of orders. Plaintiffs do not plead with any particularity the nature of the battery-quality issues, how these issues impacted Valence revenue, when the returns by Smith occurred, or whether or how Smith's backlog order was affected. The entirety of product-quality allegations as to Segway is that Valence had difficulty retaining Segway's business, and the allegations as to Smith amount only to an assertion that an unidentified product-quality issue caused Smith to return batteries sometime between 2010 and July 2012. These allegations are too vague to satisfy the heightened pleading standard applicable to securities-fraud claims. *See ABC Arbitrage*, 291 F.3d at 350.

Moreover, even if the allegations were sufficiently particularized so as to allege a material misstatement or omission by Kanode as to these statements, the totality of facts fail to give rise to a "strong inference" of fraudulent intent with respect to Plaintiffs' product-quality allegations. *See Tellabs*, 551 U.S. at 323; *Southland*, 365 F.3d at 364–66. First, any allegation that Kanode made the aforementioned statements in order to "perpetuate the facade" that Valence's revenues would continue to grow from its account with Smith is belied by Kanode's statements regarding the uncertainty of Smith revenue at the beginning of the August 3 call. Kanode highlighted Smith's decision to dual source its batteries and explained that Smith's only commitment at that point was to use Valence for filling its European needs. While acknowledging that Smith had several million dollars of backlogged orders, Kanode also disclosed that there was uncertainty as to when these orders would be filled. Kanode expressly stated that Valence had not included any Smith revenue in its projections for the second quarter of 2012.

Additionally, Valence's 2011 10-K, filed May 26, 2011, expressly disclosed that Valence had "experienced quality issues" that "resulted in the return of certain products already shipped to our

customers." And Valence's 2012 10-K, the last 10-K filed before bankruptcy, reported that Valence had not sold products to Smith since the first quarter of the 2012 fiscal year and had no open Smith orders. In light of these facts, the court finds that Plaintiffs have failed to plead a "cogent and compelling" inference that Kanode intended to deceive, manipulate or defraud the public or acted with severe recklessness when making statements regarding Valence's Smith and Segway accounts. *See Tellabs*, 551 U.S. at 323; *Ind. Elec.*, 537 F.3d at 533. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *K-tel Int'l*, 300 F.3d at 891 (internal quotation marks and citation omitted). Under the Reform Act the complaint must allege "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made." *Id.* (citing *In re Navarre Corp. Secs. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002)). The court has already concluded Plaintiffs' complaint is devoid of such facts so as to make Kanode's statements actionable, and without such facts, the court also finds Plaintiffs fail to adequately plead scienter.

(iii)    February 8, 2012 Conference Call

Valence's February 8, 2012 conference call discussed the company's third quarter 2012 financial results. Plaintiffs allege that Kanode falsely reassured investors that Valence was close to breaking even, when in reality Valence did not have the cash flow to continue operations. When questioned about whether Valence had "a reliable source of cash to get [it] to break even," Kanode responded, "We have very strong financial support from a number of different areas, and I feel very comfortable going forward that we can secure funding for both our daily activities and our growth."

Plaintiffs contend this statement misrepresented the fact that Kanode knew Valence was

facing a significant cash shortfall in the coming months, in part due to the loss of contracts from Smith and Segway on account of product-quality issues. Defendants contend any claim of fraud based on this statement must be dismissed because Plaintiffs' allegations are too vague to satisfy the requisite pleading standards and Kanode's representation is a forward-looking statement protected from liability under the Reform Act's safe-harbor provision.

The court agrees with Defendants that Plaintiffs' product-quality allegations are too vague to sustain a claim of fraud based on Kanode's statements on February 8, 2012. Plaintiffs allege no facts with sufficient particularity to give rise to a plausible claim that Valence had already lost contracts from Smith and Segway so as to render Kanode's statements false. Nor are there any facts alleged to suggest Berg had already definitively pulled his support from Valence at that time. Plaintiffs have failed to plead any facts to demonstrate that Kanode's affirmative statement that Valence had "very strong financial support from a number of different areas" was false when made.

The court further finds that the predictive part of Kanode's statement is protected as a forward-looking statement under the Reform Act. *See* 15 U.S.C. § 78u-5. The act defines forward-looking statements as those which speak predictively about the future, such as "a projection of revenues, income, . . . or other financial items;" "a statement of the plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* at § 78u-5(i). Kanode's statement predicting Valence's ability to "secure funding" going forward falls under this definition.

Forward-looking statements are not actionable if they meet any one of three criteria set forth in the Reform Act: (1) the statement is accompanied by meaningful cautionary language; (2) the statement is immaterial; or (3) the plaintiff fails to prove the defendant had actual knowledge that

the statement was false. *Id.* at § 78u-5(c)(1). For cautionary language to be meaningful, it must include "statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* "Each statement that benefits from the safe harbor must be addressed individually." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 245 (5th Cir. 2009). Boilerplate warnings and generic language reciting a "litany of generally applicable risk factors" cannot constitute meaningful cautionary language. *Id.*

For oral forward-looking statements, the Reform Act does not require that the cautionary language physically accompany the statement. 15 U.S.C. § 78u-5(c)(2)(B). "Rather, the statute explicitly allows for a forward-looking statement's incorporation by reference of cautionary language 'contained in a readily available written document, or portion theoref,' such as SEC filings or other 'generally disseminated documents.'" *In re Scientific Atlanta, Inc. Secs. Litig.*, 754 F. Supp. 2d 1339, 1350 (N.D. Ga. 2010) (citing 15 U.S.C. § 78u-5(c)(2)(B)).

The February 8, 2012 conference call, as well as the call on August 3, were accompanied by an oral statement that additional cautionary statements regarding the subject matter of the conference calls were contained in readily available written documents. These statements expressly directed call participants to refer to Valence's annual report on its Form 10-K and other periodic reports and documents filed with the SEC. At the time of the February 8 call, the participants had access to Valence's 2011 Form 10-K and Valence's Form 10-Q dated February 8, 2012, which was the subject of the call. Having reviewed these SEC filings, the court concludes they contain meaningful cautionary language as defined by the Reform Act's safe-harbor provision.

The 2011 Form 10-K warns the public about Valence's "ability to continue as a going concern" and cautions investors that Valence "may be forced to cease all operations and liquidate [its] assets." The report states prominently on its first page:

> Due to our ongoing losses, lack of liquidity and debt obligations, there is doubt about our ability to continue as a growing concern.
>
> We have experienced significant operating losses in the current and prior fiscal years. At March 31, 2011, our principal sources of liquidity were cash and cash equivalents of $2.9 million. We do not expect that our cash on hand and cash generated by operations will be sufficient to fund our operating and capital needs for the next 12 months. As a result of our limited cash resources and history of operating losses, our auditors have expressed in their report on our consolidated financial statements that there is doubt about our ability to continue as a growing concern. We presently have no further commitments for financing by affiliates of our Chairman Carl Berg. Recently, we have depended on sales of common stock under an At-Market Issuance Agreement with Wm. Smith & Co. If we are unable to obtain further financing under the At-Market Issuance Agreement or from affiliates of Mr. Berg or others on terms acceptable to us, or at all, we may not be able to fulfill our customer commitments and/or be forced to cease our operations and liquidate our assets.

The warnings continue by identifying specific ways in which Valence's lack of liquidity could materially and adversely affect its ability to continue its operations and develop its products. Valence stated it could, among other things:

- limit the research and development resources we are able to commit to the further development of our technology . . . ;

- limit the sales and marketing resources that we are able to commit to the marketing of our technology;

- have an adverse effect on our ability to attract top-tier companies as our technology and marketing partners;

- have an adverse effect on our ability to employ and retain qualified employees . . . ;

- make us more vulnerable to failing to achieve our forecasted

results . . . .

The report further summarizes Valence's history of losses, cautions investors about its ability ever

to achieve profitability, and warns of a possible filing for bankruptcy protection:

> We have incurred operating losses each year since our inception in 1989 and
> had an accumulated deficit of $594 million as of March 31, 2011. . . . We
> may never achieve or sustain sufficient revenues or profitability in the future.
> . . . If we cannot achieve a competitive cost structure, achieve profitability,
> and acquire access to capital markets on acceptable terms, we will be unable
> to fund our obligations and sustain our operations, and may be required to
> liquidate our assets, cease operations or file for bankruptcy protection.

The February 8 Form 10-Q again highlights Valence's "limited cash resources and history

of operating losses" and warns that "there is substantial doubt about our ability to continue as a going

concern." The warnings contained in this filing closely track the language in the 2011 Form 10-K,

noting the possibility that Valence will be "forced to cease all operations and liquidate [its] assets."

Plaintiffs contend these warnings are not meaningful under the safe-harbor provision because

they appear virtually unchanged in every SEC filing from 2006 onward. This court disagrees. The

fact that Valence faced the same issues from its inception in an attempt to achieve profitability with

its new technology and diversify its funding sources does not make its disclosures and warnings

hollow. A reasonable investor could read the disclosures contained in Valence's SEC filings and

be apprised of the company's liquidity issues, insecurities as to future funding, and possibility of

bankruptcy. The court will not engage in speculation over whether Plaintiffs should have ceased to

take Valence's warnings and disclosures seriously, even if Valence's prose did not vary year to year.

The court finds the warnings and disclosures to be meaningful under the safe harbor. *See* 15 U.S.C.

§ 78u-5(c)(1); *Lormand*, 565 F.3d at 245. Thus, Kanode's forward-looking statements during the

February 8 conference call cannot be a basis for liability for securities fraud.

20

(iv)    February 23, 2012 Conference Presentation

On February 23, 2012, Kanode made a presentation on Valence at the Jeffries Global Clean Technology Conference. An audience member asked Kanode to define "where [Valence is] right now" as to "cash" and "debt." Kanode responded:

> Our major shareholder is our founder, Carl Berg, who owns about 50% of the Company. Carl is a very strong supporter of this company and, therefore, with very little cash needs quarter to quarter, we look at two different funding options. We have used a shelf and also Carl, if you look at our history.
>
> Moving forward our cash needs will not be significant, but we do anticipate we need to balance the foundation of the Company and probably do a modest offering in the future, which we intend to do. However, we want to bring some of the projects that we have on the table to the light of day first so you can better gauge our process which isn't long term.

Plaintiffs contend Kanode's statements about Berg's strong support and Valence's small cash needs misrepresented the fact that Kanode knew Valence was facing a significant cash shortfall in the coming months, in part due to the loss of contracts from Smith and Segway on account of product-quality issues.

Again, the court finds Plaintiffs' allegations as to the product-quality issues too vague to satisfy the applicable pleading standards. The court also agrees with Defendants that Berg's strong support is an historical fact and there is nothing fraudulent in the assertion of that fact. The only arguable misstatements by Kanode identified by Plaintiffs is Kanode's future projection that Valence would not have significant cash needs moving forward.[5] However, these statements, even if misrepresenting the likelihood of Valence's future cash needs, are not worded as guarantees of future

---

[5]The full transcript of Kanode's conference presentation is not in the record before the court. Therefore, the court is unable to determine whether any cautionary statements accompanied Kanode's remarks at the conference so as to protect any forward-looking statements.

performance or profitability, so as to be material. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003). Moreover, the court finds that no reasonable investor would have found those statements to have altered the "total mix of information made available," in light of the financial disclosures and repeated warnings made available to the investing public in Valence's SEC filings. *See ABC Arbitrage*, 291 F.3d at 359.

     (v)     <u>May 23, 2012 Press Release</u>

On May 23, 2012, Valence issued a press release in which Kanode stated "we are confident that our experience, quality, and engineering support will continue to distinguish Valence in our growing markets." Plaintiffs argue Kanode failed to disclose that Valence and its shareholders would not be able to capitalize on these "growing markets" or any future business prospects because the company was facing bankruptcy. The court finds this statement also to be nothing more than a generalized, positive statement about Valence's competitive strengths and future prospects, which is immaterial as a matter of law. *See Rosenzweig*, 332 F.3d at 869. Plaintiffs cannot sustain a claim of securities fraud based on this statement.

     (vi)     <u>May 23, 2012 Conference Call</u>

On May 23, 2012, Valence hosted a conference call with investors, media representatives, and analysts, during which Kanode and Gottschalk were questioned about Valence's liquidity and possible filing for bankruptcy. One analyst asked Kanode about his comfort level with ending the year with a mere $1.4 million in cash reserves. Kanode responded, "[W]e are evaluating a number of short- and longterm funding alternatives . . . ." A private investor noted that the stock price for Valence was a negative $0.35 per share and asked Kanode whether Valence could declare bankruptcy. Kanode responded,

> We believe we have an excellent future in front of us. Our technology is one of the largest patent estates in the world in lithium phosphate. Lithium phosphate is becoming the go-to technology for safety and long life. We have a library of standard products if you will that are performing extremely well that have been designed over years. We have the fundamentals to move forward, and I feel very comfortable with those fundamentals. There is no doubt we're in a very difficult market and there is no doubt that the emergence of lithium has not been predictable.
>
> Given all of that, we believe we are poised to move forward and we have all the right tools to do so. And that is our position and we feel pretty good about it.

When the same investor further pressed as to whether there was "no guarantee that the company cannot declare bankruptcy," Kanode stated,

> You know I cannot give you guarantees of the future performance of the economy or other areas. I can only report to you that we have the tools to basically move forward with a great product line, and we're seeing very good markets that need it.

Finally, an analyst further questioned "how [Valence] think[s] about managing the cash burn and the working capital going forward with $1 million of cash and 300 people on payroll?" Gottschalk responded by reiterating Kanode's previous statement that Valence was "evaluating a lot of short-term and long-term funding alternatives" and that Valence was "in a very, very good position right now to sustain ourselves going forward . . . ." The analyst pressed by asking "What alternatives?" Gottschalk stated that the opportunities

> would be borrowings as necessary and also raising equity through the sale of stock and other–just any other methods that we could come up with for now, but mostly through the sale of stock.

Plaintiffs claim "on information and belief" that these representations were materially false and misleading because Defendants knew by May 2012 that: (1) Berg would no longer pump money into Valence and save it from its debts; (2) Valence was not making efforts to raise capital by selling

equity; (3) Valence was not actively exploring financing opportunities; (4) financing would be difficult because Berg had refused to release any collateral for other debt financing; and (5) Valence had hired bankruptcy counsel, was headed for bankruptcy, and would not survive as a going concern.

Having considered the identified statements from the May 23 call and the entirety of Plaintiffs' allegations, the court finds that none of these statements constitute actionable misrepresentations or omissions. General positive statements about Valence's "excellent future" do not contain any misrepresentation of material fact and are therefore nonactionable as a matter of law. *Southland*, 365 F.3d at 372; *Nathenson*, 267 F.3d at 418. Nor would any reasonable investor view Defendants' general statements about Valence being in a "very, very good position" to sustain itself going forward as significant in their deliberations regarding their investment in light of Valence's contemporaneous disclosure of its financial circumstances in its 2012 Form 10-K. *See Southland*, 365 F.3d at 362. The public was well informed as to the riskiness of an investment in Valence: a company that had never turned a profit in the course of its more than 10-year history and whose stock had traded below $1.00 per share for most of the time period relevant to this case.

Furthermore, even if Valence had in fact hired bankruptcy counsel and was seriously considering filing for bankruptcy, Defendants would not have been required to disclose this plan to investors, as silence does not give rise to securities fraud unless there is a duty to disclose information. *See Chiarella v. United States*, 445 U.S. 222, 232 (1980). Although Defendants would be required to disclose "the nature and results of any bankruptcy," 17 C.F.R. § 229.101(a)(1), or "any material pending legal proceedings," including bankruptcy, *id.* § 229.103, there is no requirement to disclose the retention of counsel to examine the possibility of future bankruptcy. *See Walzer v. UAL Corp.*, No. 08-0622-cv, 2009 WL 3617808, at *1 & n.1 (2d Cir. Nov. 4, 2009). Plaintiffs do

24

not allege there was a pending bankruptcy petition at the time of the May 23 conference call. Accordingly, Plaintiffs' only duty of disclosure would be the "limited duty to update concrete, forward-looking statements that were rendered misleading by subsequent events." *See id.* at *1 n.1.

Additionally, any allegation of a failure to disclose the possibility of bankruptcy is contradicted by the information contained in Valence's 2012 Form 10-K, which was filed on the same day as the conference call. That filing reported on Valence's "significant amount of indebtedness": $71.2 million of total consolidated indebtedness as of March 31, 2012, which included the third-party loan that was to mature in June 2012, with only $1.4 million in cash reserves. Valence acknowledged publicly to investors that this indebtedness could "cause [Valence] to cease business and liquidate [its] assets and operations." The 2012 Form 10-K also disclosed the impending likelihood that Valence's stock would be delisted from The NASDAQ Stock Market for failure to satisfy its minimum bid requirement. In light of these financial disclosures and warnings, the court finds that the market had been adequately informed of the "dire nature" of Valence's financial condition and the possibility that Valence would be forced to seek bankruptcy protection. Thus, even if there were a duty to disclose any affirmative steps taken by Valence toward bankruptcy, the court finds that such information would be immaterial in light of the total mix of information provided to investors. *See ABC Arbitrage*, 291 F.3d at 359; *see also Beleson v. Schwartz*, No. 09-1281-cv, 2011 WL 1252281, at *2 (2d Cir. Apr. 5, 2011) (where company disclosed enormous losses, crushing debt, and possibility of bankruptcy, failure to disclose contingency bankruptcy plan was immaterial).

The only remaining statements from the May 23 call that could be actionable are Defendants' representations regarding Valence's current activities to secure additional financing opportunities.

Both Kanode and Gottschalk stated that Valence was "evaluating a lot of short-term and long-term funding alternatives" in order to stave off bankruptcy. The court agrees with Plaintiffs that these statements are representations of material fact that, if false, could give rise to a claim for securities fraud. Plaintiffs allege Defendants' statements were false at the time they were made because Defendants knew that Valence was in fact not seeking additional funding and Berg would no longer step in to save the company. Defendants argue Plaintiffs' complaint lacks any particularized allegations to support this claim.

Where a plaintiff's allegations are made on information and belief, the plaintiff must state with particularity all facts on which that belief is formed. *ABC Arbitrage*, 291 F.3d at 350. Plaintiffs base these allegations solely on the resignation letters of two former members of Valence's Audit Committee, Bert C. Roberts, Jr., and Donn V. Tognazzini. According to the complaint, Roberts's July 10, 2012 letter states that Valence had been ready to file for bankruptcy "for several weeks," and Tognazzini's June 28, 2012 letter states that Valence did not actively pursue any alternative financing options until "the shadow of insolvency" was staring Valence "in the face." Tognazzini's letter also criticized Valence's inadequate efforts in exploring the capital markets and approaching "potential sources of financing." Plaintiffs claim these letters demonstrate the falsity of Defendants' statements on May 23 that they were pursuing a number of short-term and long-term financing options. This court disagrees.

The statements in the Roberts and Tognazzini letters are exceedingly vague. Taken together, the letters merely stand for the proposition that Valence was prepared to file for bankruptcy weeks before July 12, waited too long to pursue alternative financing opportunities, and was inadequate in exploring available sources of funding. Neither letter asserts what financing activities Valence did

undertake and, most importantly, when. To be fraudulent, a statement must be false or misleading "at the time it was made." *In re BP p.l.c. Secs. Litig.*, 843 F. Supp. 2d 712, 772 (S.D. Tex. 2012). Plaintiffs' complaint does not contain sufficient particularized facts that if taken as true establish the falsity of Defendants' May 23 statements. Accordingly, Plaintiffs have failed to make out a claim of securities fraud based on these statements.[6] *See ABC Arbitrage*, 291 F.3d at 350.

## IV. Conclusion

In summary, having reviewed the entirety of Plaintiffs' allegations, alongside the public documents filed with the SEC and the transcripts of those calls included in the record, the court concludes that Plaintiffs have failed to allege a plausible claim of securities fraud. In the absence of any primary securities-fraud violation, the court will also dismiss Plaintiffs' control-person claims against Kanode. *See* 15 U.S.C. § 78t(a); *Lovelace*, 78 F.3d at 1021 n.8 (control-person liability is secondary only and cannot exist in absence of a primary violation).

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Plaintiffs' Class Action Consolidated Complaint (Clerk's Doc. No. 30) is **GRANTED**.

**IT IS FURTHER ORDERED** that all claims and causes of action asserted by Plaintiffs in this suit are **DISMISSED WITH PREJUDICE**.

SIGNED this _____ day of November, 2013.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

---

[6]Because the court finds that none of the statements at issue regarding Valence's liquidity and the possibility of its filing for bankruptcy constitute a material misstatement or omission, the court does not, and need not, address Defendants' argument that Plaintiffs' complaint fails to sufficiently allege that Defendants made such statements with the requisite state of mind. *See* 15 U.S.C. § 78u-4(b)(2).